### In re MINKOVE.

(First Division.   Juneau.   February 4, 1918.)

No. 14, in Bankruptcy.

**1. Chattel Mortgages ⬤◌190—Retention of Possession—Bankruptcy.**

One Fox advanced the money with which one Minkove purchased a stock of hardware. M. was in sole possession of the goods at all times, and bought and sold and expended the income without oversight or control by F. When other debts had accumulated M. gave F. a chattel mortgage to secure the debt due to F., but remained in sole possession, buying and selling with a free hand, for an indefinite period of time, and making no returns to F. or payments upon his debt from the proceeds of sales. On voluntary bankruptcy proceedings by M., the debtor F. made claim for a preference. *Held,* the chattel mortgage was fraudulent and void, as to other creditors, and that F. was not a preferred creditor.

**2. Bankruptcy ⬤◌142—Chattel Mortgages—Validity.**

Under the laws of Alaska, when it appears that a mortgagee of personal property has given the mortgagor unlimited authority and power to dispose of the property in the usual course of trade, without accounting therefor, the mortgage is void as to other creditors in bankruptcy proceedings, even though there was no actual fraudulent intent, and it is equally void as to the trustee in bankruptcy of the mortgagor.

**3. Chattel Mortgages ⬤◌186—Statutes—Construction.**

The second clause of section 740, Compiled Laws of Alaska 1913, permitting a mortgagor to remain in possession of mortgaged personal property, being in derogation of the common law, must be strictly construed.

This is a contest between P. H. Fox, petitioning to be allowed a preference out of the proceeds of sale of the assets of J. Minkove, bankrupt, and V. A. Paine, trustee of said bankrupt. The immediate question involved is whether or not the referee's findings and order of the referee should be sustained.

---

⬤◌See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On June 13, 1913, Joe Minkove, a plumber and dealer in hardware at Douglas, Alaska, made, executed, and delivered to P. H. Fox his certain chattel mortgage of and upon a stock of hardware, plumbing goods, and fixtures as security for the payment on June 13, 1914, of $2,300 and interest, according to the terms of a certain promissory note therein described. Possession of ·the mortgaged chattels was not delivered to, or retained by, the mortgagee; the mortgage did not provide "that the property may remain in the possession of the mortgagee." Said mortgage was filed in the proper recorder's office, but it was not accompanied by any affidavit "of all the parties thereto" as to good faith, etc., as provided in section 740, Comp. Laws Alaska 1913, nor was such affidavit filed at any time. This mortgage and note are hereinafter referred to as the first mortgage, or first note, as the case may be.

Minkove continued in possession of said stock, buying and selling in the usual course of business, and living out of the business, without let or hindrance from Fox or any other person, until June 14, 1914. During that interval he never accounted to Fox for the proceeds of the sales, nor did Fox ever ask him for an accounting, although he had, by said last-mentioned date, reduced to $1,848.50 the amount due and owing to Fox. In the meantime he' changed his place of business to the Henson Building in Douglas.

On said 14th day of June, 1914, Minkove gave to Fox another chattel mortgage "of the stock in trade now in or upon the afore-mentioned premises, and all other stock of every description that may be placed therein at any time prior to the full payment of the indebtedness secured by this mortgage." This mortgage was expressed to be "as security for the payment of $1,848.50 on the 14th day of June, 1914," with interest, according to the terms of a certain note therein described. This note and mortgage were intended and supposed to be a revivor or renewal of the former note and mortgage.

Again, possession of the mortgaged chattels was not delivered to or retained by the mortgagee, nor did said mortgage provide "that the property may remain in possession of the mortgagee." Said mortgage was filed in the office of the proper recorder, but it was not accompanied by any affi-

davit "of all the parties thereto" as to good faith, etc., as provided in section 740, Comp. Laws Alaska 1913, nor was such affidavit filed at any time. This mortgage and note are hereinafter referred to as the second mortgage, or second note, as the case may be.

Minkove continued in possession of said last-mentioned stock, buying and selling in the usual course of trade, and living out of the business, without let or hindrance from Fox or any other person, until about December 7, 1914. During the interval he never accounted to Fox for the proceeds of the sales, and never paid him anything on account, nor did Fox ever ask him for an accounting.

On or about December 7, 1914, the Seattle Hardware Company, an unsecured creditor of Minkove to the amount of $1,007.33, having sued out an attachment against Minkove, threatened, and was about, to levy the same upon his stock in trade; whereupon Fox came to the rescue of Minkove, and by joining with him in the execution as maker of a promissory note for $1,007.33, dated December 7, 1914, payable 90 days after date, to said Seattle Hardware Company, averted the threatened attachment.

On the said 7th day of December, 1914, Minkove made and executed to Fox his promissory note for $2,944.46 (that amount being the amount of the second note and interest thereon, plus the amount of the said note to the Seattle Hardware Company), payable on or before June 15, 1915, with interest at 10 per cent. per annum from date, together with attorney's fees, and on the 8th day of December, 1914, in order to secure said note, gave him a mortgage, dated December 7, 1914, of the stock then on hand or afterwards to be acquired.

Possession of the mortgaged chattels was not delivered under this mortgage, but the latter contained this provision, to wit:

"And it is further agreed that the above-described personal property may remain in the possession of the said mortgagor, subject to the terms of this mortgage,"

—and had annexed thereto the affidavits of good faith, etc., required by section 740, C. L. Alaska 1913, and said mortgage was duly filed. This mortgage and note will be here-

inafter referred to as the third mortgage, or third note, as the case may be.

After the execution and delivery of this third note and mortgage and until about January 15, 1915, Minkove continued in actual possession of the stock, buying and selling in the usual course of business, and living out of said business, without let or hindrance from Fox or any one else, and without paying anything to Fox or accounting to him.

On the last-mentioned date Minkove filed in this court a voluntary petition in bankruptcy and was duly adjudicated a bankrupt. Said V. A. Paine was duly elected as trustee, and duly took possession of what was left of the said mortgaged goods. Over the objection and protest of Fox, he duly sold said bankrupt stock for the sum of $3,100. Fox filed a petition with the referee that his said third note and mortgage be paid as a preferred claim, and that he be allowed attorney's fees. Respondent Paine, trustee, and several creditors, contested Fox's right to any lien by virtue of said mortgage, and his claim for attorney's fees, contending that said mortgage is void under the law of Alaska, and that, even if good under said law, it is a preference, illegal and void under the bankruptcy law, and no attorney's fees should be allowed in any event.

Evidence was heard by the referee, and his findings and order upheld the validity of the mortgage to the extent of $1,937.13, and denied its validity to the extent of $1,007.33; that being the amount of the Seattle Hardware Company's claim for which the joint note was given. Referee also denied the claim of attorney's fees.

Both parties, being dissatisfied with the referee's findings and order, bring the same, together with the evidence, to the court to have same reviewed.

Hellenthal & Hellenthal, of Juneau, and J. T. Hunt, of Seattle, Wash., for petitioner Fox.

Gunnison & Robertson, of Juneau, for respondent Paine.

JENNINGS, District Judge. The matter has been briefed with a great deal of painstaking and diligent research by the counsel on both sides, thus very materially lightening the labor of the court. Let us consider the complaint of Paine,

trustee, that the referee erred in finding No. 3 and in his conclusion therefrom.

This finding is to the effect that (a) "at the time of giving said [third] mortgage it was impliedly understood and agreed between the bankrupt and petitioner that the bankrupt should account to the petitioner for the money received from the sale of the mortgaged goods, and that he should use the money derived from the sale of goods to pay off the mortgage debt due petitioner;" (b) that as to $1,937.13, said mortgage should "take effect as of the date of the second mortgage, of which it is a renewal"; and that (c) "it is a good and valid mortgage against the trustee."

The third mortgage, having been made for a valuable consideration, and providing "that the above-described personal property may remain in the possession of the said mortgagor, subject to the terms of the mortgage," and being accompanied by the required affidavits, and having been duly filed (Exhibit C), is prima facie valid in its inception, not only between the parties but as against creditors. The effect of our statute (Comp. Laws Alaska 1913, § 740) is that, when such permission as that is incorporated in a mortgage, which is accompanied by the statutory affidavits as to good faith, etc., actual delivery of possession is not required. Delivery by the mortgagor and retention of possession by the mortgagee of the mortgaged chattels is of the very essence of a lien, but while the statute dispenses with possession, on certain conditions, yet all the other incidents and requirements of a valid mortgage are left untouched. Now, says the Supreme Court:

"It is not difficult to see that the mere retention and use of personal property until default is altogether a different thing from the retention of possession accompanied with a power to dispose of it for the benefit of the mortgagor alone. The former is permitted by the laws of Indiana, is consistent with the idea of security, and may be for the accommodation of the mortgagee; but the latter is inconsistent with the nature and character of a mortgage, is no protection to the mortgagee, and of itself furnishes a pretty effectual shield to a dishonest debtor."

And further:

"We are not prepared to say that a mortgage under the Indiana statute would not be sustained which allows a stock of goods to be retained by the mortgagor, and sold by him at retail, for the ex-

press purpose of applying the proceeds to the payment of the mortgage debt. Indeed, it would seem that such an arrangement, if honestly carried out, would be for the mutual advantage of the mortgagee, and the unpreferred creditors. But there are features ingrafted on this mortgage which are not only to the prejudice of creditors, but which show that other considerations than the security of the mortgagees, or their accommodation even, entered into the contract. Both the possession and right of disposition remain with the mortgagors. They are to deal with the property as their own, sell it at retail, and use the money thus obtained to replenish their stock. There is no covenant to account with the mortgagees, nor any recognition that the property is sold for their benefit. Instead of the mortgage being directed solely to the bona fide security of the debts then existing, and their payment at maturity, it is based on the idea that they may be indefinitely prolonged. * * * In truth, the mortgage, if it can be so called, is but an expression of confidence, for there can be no real security where there is no certain lien. Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time." Robinson v. Elliott, 89 U. S. (22 Wall.) 523, 22 L. Ed. 758.

So that it may be pertinent to ask this question, to wit: Leaving out of consideration the question of possession of the mortgaged goods, is there in the case at bar any thing, or things, the presence of which renders the mortgage invalid? That a mortgage valid in inception, or on its face, may by private understanding between the parties, or by a course of conduct, become invalid is well settled. In Rocheleau v. Boyle, 11 Mont. 451, 28 Pac. 872, the court expressed it thus:

"Now, if a mortgage of goods be made, as provided by statute, leaving possession with the mortgagor, and it be understood, agreed, or knowingly permitted (for, if it is knowingly permitted, it is understood and agreed) to the mortgagor to place the mortgaged goods on sale, not subject to the mortgage, to be sold, carried away, or consumed, and to use the proceeds without reference to the mortgage, this arrangement annuls every vital element of the mortgage, so far as concerns the goods to which such arrangement or permission extends. The mortgage, under such circumstances, becomes a mere sham, a mere appearance, a delusion, asserting in form what is not in fact, as admitted by the conduct of the parties. The possession does not remain. Nor does the property remain. It is shifted over to those who will come and buy, and is carried

away without respect to the mortgage, and the proceeds devoted to purposes other than answering for the debt mentioned in the mortgage. The parties to such an arrangement have departed from the observance of a statutory requirement as to the property to which such arrangement or permission applies, and we think there ought to be no hesitation in holding the mortgage void as to property so dealt with, or, in other words, that such property is put out from under such mortgage by the conduct of the parties in re- lation to it."

And in Sabin v. Wilkins, 31 Or. 450, 48 Pac. 425, 37 L. R. A. 465, thus:

"The intent and purpose of the parties in giving and receiving a chattel mortgage is the test of its validity *at its inception;* but, as it is a thing capable of modification by subsequent agreement, either expressed or implied, by co-operative and willful disregard of its terms and conditions, it is a prerequisite to its continuing validity that good faith and fair dealing be maintained toward those whose interests may be affected by it. A chattel mortgage given primarily for the benefit of the mortgagor is void as against creditors from the beginning (Hill's Ann. Laws Or. § 3053); but, if given bona fide, and the parties, by their subsequent treatment of it and the property covered by it, convert it into an instrument calculated to effectuate the same purpose, it is none the less fraud- ulent and void *from the time such purpose is promoted.*"

And in Greig v. Mueller, 66 Or. 31, 133 Pac. 94, 46 L. R. A. (N. S.) 725, thus:

"If the parties, by their subsequent treatment of it and of the property covered by it, converted it into an instrument calculated to delay or defraud creditors, it will be thus rendered fraudulent and void from that time. * * * Thus with the acquiescence of the mortgagee the mortgage became an instrument to hinder and delay creditors, in violation of the terms of the statute. To main- tain his preference the mortgagee under such a mortgage must be diligent to require observance of its terms and spirit."

Now, in this case, it appears from the transcript of the evidence returned by the referee that Fox testified as follows:

"A. Well, how that happened, McLean was deputy United States marshal, and he came over there to serve an attachment; so Min- kove called me down. He was feeling pretty bad about it, and he said, 'If you will help me out this time, I will do anything in the world for you. These people seem to want to crowd me to the wall, and if you will help me out this time, I will do anything in the world for you, *and every evening I will turn over what- ever money I take in during the day toward paying the indebted-*

*ness of the Seattle Hardware Company;"* and I asked him how long it would take, and he said he thought it would be done in 60 days.

"Q. Did you make any inquiry? A. Yes; Mr. Faulkner was there, and he said that, if I would sign a note with Mr. Minkove, he would give us 90 days to pay. He said there would be no trouble in handling it in that time, so I signed a note with Minkove for this indebtedness with the Seattle Hardware Company, and Mr. Faulkner said he would give us 90 days."

And as follows, in substance:

"From December 7, 1914, up to January, 1915, Minkove kept his business open and sold to what few customers he could in the town of Douglas, and during that period he did not pay anything on my claim. I used to go down there and see him." (Page 5.) "I made inquiries about the business" (page 24), "and I thought he was doing a good business."

When asked if he did not think it strange, then, that Minkove paid nothing on the mortgage, Fox said:

"Well, he had made a trip to Seattle, and got married, and he had been put to considerable expense, and I thought, after he settled down, he would start in again.

"Q. And although he paid you nothing since the preceding December, and although his business was good, you thought you could afford to sit by and wait to get a payment, and you did not ask Minkove to tell you what his daily sales were, did you, or make a report to the bank that he had not made any payment on the mortgage? A. No, sir."

And speaking about the time of the third mortgage:

"I thought it was mighty funny that he did not turn over *some* of the money to me that he was taking in." (Page 25.)

Minkove's account of the giving of the third mortgage was substantially as follows:

"After I had signed the Seattle Hardware Company note in Douglas, Fox told me to go over to Juneau and make out a new mortgage." (Page 100.)

He further testified that after December 7, 1914, he did not pay Fox anything, notwithstanding that during that time he deposited in bank $184.75. (Page 79.) As to how much he took in, there was no way of telling. As to outstanding bills:

"Well, when they were overdue, I used to pay as much as I could. When I took in a little money, I used to send it. I used to send a little at a time. I was not making any money, not able to meet my bills, Mr. Fox used to come in once in a while; but at the time

I closed I had not recently had any conversation with him about the business." (Page 80.) "From December, 1914, up to the time I went into bankruptcy, I sold whatever I could in my business, and never accounted to Fox for any of it—for any of the daily cash receipts, or anything of that kind. During that time I got in new goods, but don't know how much" (page 82); and "I paid a few little bills; I was trying to give every one what was right" (page 98). "My creditors were pushing me all the time" (page 102).

His account of the rupture with Fox was as follows:

"Q. Mr. Minkove, you seem to know pretty well how much each one of these items were. You had a great deal of time to figure over your obligations before you started to go into bankruptcy? A. I didn't figure at all. They have been pinching me very hard, and I decided in a minute, and I will explain in a few words. Mr. Fox came in the day before I closed the place, I believe it was. 'Well, Joe,' he said: 'we will get Burkland in here and let him attend to the store, and you will go out and do the work, and I will take out everything from the register;' and I asked him where I would get money to live on, and I said, 'I will not do that.' I said, 'If you pay all the bills what I owe, you can have the store, and I will lose the two years in the business.' He said he would not do that. Then I said I might just as well close the place. He said, 'I am going to see my lawyers.' I went that afternoon, and took the first lawyer I could meet, just came over the ferry and got Mr. Burton, and explained the whole business and standing, and I just went through bankruptcy.

"Q. You gave up because Mr. Fox wanted to interfere with the management of your store? A. When Mr. Fox wanted to put a man in the store, and pay from the store the money, and not to give me anything for living; also took bills what I owed, and he will keep that book until he gets his money back, he says."

We see from the evidence that Minkove started business in the early part of 1912 on money, credit, or goods furnished by Fox. For that money, credit, or goods Fox allowed Minkove a free hand, accepting whatever he was willing to pay, never asking for or obtaining an accounting. Fox had no security whatsoever, nor is there evidence of any agreement, express or implied, for any security, or for any accounting to, or supervision by, Fox.

We see that after the first mortgage was given (June, 1913), and up to the time of the second mortgage (June, 1914), the conduct of the parties experienced no change—i. e., Minkove never accounted to Fox; that he paid him just whatever he pleased and whenever he pleased; that he bought and sold at will, without any protest by Fox or ex-

press permission from him; that he used some of the proceeds of sales—apparently just as much or just as little as he chose—for living expenses; and, in general, that he carried on business as if there had never been a mortgage to Fox, all this with the passive acquiescence of Fox.

We see that after the second mortgage (June 13, 1914) the former conduct of the parties was continued, with this exception, to wit, that during this entire period Minkove never paid Fox anything at all, and that renders the conduct worse than the former conduct.

In December, 1914, however, Fox was told by Faulkner that the mortgages to him were void on account of the fact that Minkove was allowed to retain possession of the mortgaged goods without permission to do so having been provided in the mortgage; so, evidently, Fox resolved that the third mortgage should not be open to that objection. The said defect was cured by the "substituted possession"; but having cured the defect, we see that the parties fully resumed the former course of dealing with the mortgaged property, and when, one morning in January, 1915, Fox did appear and propose to put in a man, and intimated that hereafter he (Fox) "would take out everything from the [cash] register," Minkove indignantly asked:

"Where will I get the money to live on, and I said, 'If you pay all the bills what I owe, you can have the store, and I will lose the two years in business.' He said he would not do that. Then I said I might just as well close the place. He said, 'I am going to see my lawyers.' I went that afternoon, and took the first lawyer I could meet; just came over on the ferry and got Mr. Burton, and explained the whole business and standing, and I just went through bankruptcy."

Indignant because he had never agreed to do any such thing, and there had never been any such course of dealing—it was an innovation to him. Can there be any doubt that if, after the giving of these mortgages, Minkove had sold his entire stock of goods in usual course of trade and put the money in his own pocket, without paying Fox anything, the purchaser would have obtained a good title, to the utter destruction of Fox's paper mortgages?

Fox, by his silence, by his inaction, acquiesced in the sale by Minkove of property covered by the mortgage. More—

he has by such conduct given him an unlimited power of disposition; he has entirely nullified that "substituted delivery" to him which he obtained by compliance with the statute. He never asked for or got an accounting; he never even inquired, or was told, how much Minkove was taking out of proceeds of sales of his (Fox's) mortgaged chattels to live on. He has not been active or vigilant; he has, rather, been supinely neglectful; he has let go of his own security, and robbed his own mortgage of the essential ingredient of all good mortgages, to wit, its lien nature, its security function.

We have a statute in the District of Alaska reading as follows (section 550, Comp. Laws Alaska 1913):

"All deeds of gift, all conveyances, and transfers of assignments, verbal or written, of goods and chattels or things in action, made in trust for the person making the same, shall be void as against the creditors, existing or subsequent, of such person."

That statute is identical with section 3053 of the Oregon Code (2 Hill's Codes 1887, p. 1371), and the latter statute had received judicial application by the Oregon court at the time it was enacted into the Alaska Code.

Judge Deady, of the United States District Court for Oregon, in Catlin v. Currier, 1 Sawy. 7, 5 Fed. Cas. 300, No. 2,518, applied it in 1870 to just such a case as his. He held, not only that such a course renders the mortgage obnoxious to the statute, saying (5 Fed. Cas. 301):

"A chattel mortgage is a pledge of personal property as a security for the performance of some act—such as the payment of an existing debt. The law allows the property pledged to remain in the possession of the mortgagor if the mortgage is put on record as notice to the world. But if the mortgage be also coupled with a condition or agreement that the mortgagor may treat the goods as if he were the owner of them—may sell them at his option and receive the proceeds to his own use—such condition or agreement avoids the mortgage. The two cannot stand together. Such use of the mortgaged property by the mortgagor is utterly inconsistent with the idea of giving a pledge or security to the mortgagee. In legal effect it is a sham, a nullity—a mere shadow of a mortgage, only calculated to ward off other creditors—a conveyance in trust for the benefit of the person making it, and therefore void as against creditors,"

but also that it should be held void as a matter of law, saying (5 Fed. Cas. 302):

"But it is said by the counsel for defendant that the question of 'fraudulent intent' under the statute is a question of fact (Code Or. 657), and that, as the court has found as a matter of fact that the defendant acted in the premises without any intent to defraud any one, the only conclusion of law proper to be drawn from the facts is in favor of the validity of the mortgage. This argument, it seems to me, is based upon two erroneous assumptions: First, that the fraudulent intent of which the statute speaks as sufficient to avoid a mortgage is, in any case, the intent of the mortgagee; and, second, that the question of 'fraudulent intent' is involved in this case at all. The 'fraudulent intent,' which by section 52 of the chapter on conveyances (Code Or. 657) is made a question of fact in all cases arising under titles 2, 3, and 4 of that chapter, is the intent of the grantor or vendor, and not that of the grantee or vendee. It is not found in this case whether Daly, the alleged mortgagor, acted in good faith or not. It is possible that he acted in bad faith, notwithstanding the defendant acted in good faith. But the fact is not material. Nor does section 52 of the chapter on conveyances include the provision of the statute (Code Or. 339) which furnishes the special rule as to when a sale or assignment or mortgage of personal property is to be deemed fraudulent and void as to creditors, because not accompanied by any immediate delivery and a continued change of possession.

"As to the second error of the argument under consideration, it is sufficient to say that such a mortgage or conveyance as this—a conveyance in trust for the party making it—is declared void as to creditors, as a matter of public policy, without reference to the intent of the parties thereto. The law assumes absolutely, and beyond doubt correctly, that in no circumstances can such a transaction be upheld in justice to creditors. That is this case, and whatever may have been the intention of the parties, the law for the protection of the general creditors of the debtor declares the so-called mortgage void, because made in trust for Daly."

The matter is not helped by our statute declaring fraudulent intent to be a question of fact, for there is a plain distinction between "void" and "with fraudulent intent."

In the case of Orton v. Orton, 7 Or. 479, 33 Am. Rep. 717, Judge Boise announced the same doctrine, independently of Judge Deady's decision, saying:

"The mortgage is admitted to be sufficient in form and properly filed so as to give it validity, unless it was fraudulent in its inception, or rendered void by the subsequent acts of the parties to it. The testimony of both the mortgagor and mortgagee shows that the mortgage was executed to secure the payment of a note for the sum of $2,152, which note was made in lieu of a former note for $2,000 and interest, made February 2, 1878. The consideration of the $2,000 note was the sum of $900, loaned at that date by Iri Orton to his son, M. W. Orton, and his signing as surety for his

son a note to Ried and Cox for $1,100. If this testimony of the Ortons is true, then we think there was a valuable consideration for the note and mortgage. Their testimony, though questioned by the appellants, is not contradicted in this regard. But conceding that the mortgage was valid in its inception, the other question and the main question in this case is, Did the subsequent conduct of the parties to this mortgage render it void as to the attaching creditors, L. Goldsmith & Co.?

"The evidence proves that, after the execution of the first mortgage, Iri Orton permitted his son, M. W. Orton, the mortgagor, to continue to sell the mortgaged goods, which was a stock of merchandise, and apply the proceeds to his own use. And it seems from the evidence that it was the intention of said Iri, at the time he took this mortgage, to permit his son to use the goods in the same manner as he had used them before the mortgage was given, and that this same understanding continued after the second mortgage (the one sued on) was given, and up to the time that the goods were attached by L. Goldsmith & Co. The respondent testifies that he knew the store was kept open and the goods were being sold by his son the same as before the mortgage was given, and when being examined as a witness, he was asked this question: 'It was your calculation that he (M. W. Orton) should just go along, and if everything went smooth, that he should sell goods and get other goods, and go ahead?' To which he answered: 'Yes, sir; that was the idea.' And again he was asked: 'And you expected him to do that, didn't you?' Answer: 'I didn't know when I might close him right out; I didn't know when. If he could have done well, I should not have closed him out.' He was then asked what he meant by doing well, to which he answered: 'If he could have sold a good deal of goods, and got money, to keep him from going under.' It is true that the respondent claims that his son was not to so far diminish the stock of goods as to render it insufficient to the ample security of the note. But there was an unlimited right to dispose of the goods, and if the entire stock had been sold by M. W. Orton prior to the commencement of this suit, the respondent could not, under the state of facts developed in this case, have maintained replevin or trover against the purchasers for the goods so sold; that is, no lien attached to the goods that could have been enforced against the purchasers thereof in good faith. Where there is no lien there is no mortgage, for the lien which attaches to the property mortgaged is the very essence of the mortgage. We think that, where it appears either on the face of the mortgage or by parol evidence that the mortgagee of personal property has given to the mortgagor an unlimited power to dispose of the property mortgaged, for the use of the mortgagor, that the mortgage is void as to purchasers and attaching creditors of the mortgagor.

"It was claimed by the respondent's counsel in the argument that this mortgage is aided by the statute of this state (section 766, page 262), which provides that every sale of personal property capable of immediate delivery to the purchaser, and every assignment of such

property by way of mortgage or security, or upon any condition whatever, unless the same be accompanied by an immediate delivery and be followed by an actual and continued change of possession, creates a presumption of fraud as against the creditors of the seller or assignee during his possession, disputable only by making it appear, on the part of the person claiming under such sale or assignment, that the same was made in good faith, for a sufficient consideration, and without intent to defraud creditors. But the presumption herein specified does not exist in the case of a mortgage duly filed or recorded as provided by law. This statute does not in any way reach or provide for the case before the court. This mortgage is regular in form, and is recorded. The presumption raised by the statute, which may be rebutted, is as to mortgages that have not been recorded. But the statute is silent as to the effect of a provision in the mortgage or an agreement between the mortgagor and mortgagee, that the mortgagor may sell the mortgaged property; and when this fact is made to appear, as in this case, then it becomes the question of law for the court to determine what shall be the legal effect of such an agreement as affecting the creditors of the mortgagor.

"This question has been the subject of much discussion in the courts, and there is some apparent diversity in the authorities. We think the weight of authority as well as reason is in favor of the rule before indicated, that where there is an unlimited power given to the mortgagor by the mortgagee to sell the mortgaged property which still remains in his possession, that the mortgage is void as against the attaching creditors of the mortgagor. In this case it was the manifest intention of Iri Orton to have M. W. Orton continue the business in his store, and sell the goods in the same manner as before the mortgage was given. This power to sell and continue the business as before enabled M. W. Orton to appear as the unembarrassed owner of the goods, and enabled to obtain credit which would have been denied him had the right to sell the goods been denied. As the power to sell was unlimited, there was no security retained in the goods to Iri Orton; for he abandoned his lien by his mortgage when he granted the power to his son to do with the goods the same as he had been doing. Such an agreement was utterly inconsistent with his claim under the mortgage, and annulled its provisions."

This case was cited with approval and followed in Jacobs Bros. v. Ervin, 9 Or. 52, and again in Bremer & Co. v. Fleckenstein, 9 Or. 266, and still, as late as June, 1913, in Greig v. Mueller, 66 Or. 27, 133 Pac. 94, 46 L. R. A. (N. S.) 722. Indeed the Circuit Court of Appeals for the Ninth Circuit has said, in Scandinavian-American Bank v. Sabin, 227 Fed. on page 582, 142 C. C. A. 214:

"The Supreme Court of Oregon has consistently held that when it appears either upon the face of the mortgage, or by parol evi-

6 A. R.—6

dence aliunde, that a mortgagee of personal property has given the mortgagor unlimited power and authority to dispose of the property in the usual course of trade, the mortgage is void as to attaching creditors, even though there was no actual fraudulent intent on the part of either of the parties to the instrument."

But it is urged by petitioner that, as the different states have diverse rulings on this point, this court should follow the rulings of the Montana courts, from which, he says, our statute was taken, and those rulings, he maintains, are the opposite of that of the Oregon cases. I think the petitioner is in error in the statement that the law of mortgages on this point prevailing in Oregon was taken from the Montana statute. It is only section 740, C. L. Alaska 1913, providing for the substituted delivery, which is taken from Montana. The general rule referred to, to wit, that the permission implied or expressed to the mortgagee to sell the mortgaged premises and appropriate the proceeds otherwise than in payment of the mortgage debt, and that a mortgage may be rendered invalid by the subsequent conduct of the parties, rests upon no statute at all. Robinson v. Elliott, 89 U. S. (22 Wall.) 513, 22 L. Ed. 758.

That case has never been overthrown on the general attributes of a good mortgage. It is true that the case was decided "with reference to what was supposed to be the local law of Indiana when the case arose, and that the later Indiana decisions take away much of its force" as an authority binding in that state; yet that portion which is general has never been overthrown by the Supreme Court, although Etheridge v. Sperry, 139 U. S. 266, 11 Sup. Ct. 565, 35 L. Ed. 171, does intimate that, in the absence of local interpretation, the court would not now go so far as to hold that the question "was one of law so much as it is one of fact." This, however, in the *absence of local interpretation.*

I think that the evidence shows that there was such a course of conduct between the parties as, under the Oregon authorities, supra, rendered all the mortgages invalid, and that any creditor could take advantage of the invalidity. This being the case, "it cannot be doubted" that the trustee in bankruptcy may assert the rights of creditors. In re Antigo Screen Door Co., 123 Fed. 254, 59 C. C. A. 248.

I think, therefore, that the referee erred in the making of the third finding. I think his finding should have been to the

effect that the conduct of the parties was such as to invalidate all of the mortgages, as against creditors.

Although, in my opinion, the above disposes of the case, yet there is another consideration, which I think is equally fatal to petitioner, and that is expressed when I say that I think, that irrespective of the validity or invalidity of the third mortgage under state law, the mortgage constituted an illegal preference under the Bankruptcy Act and its amendments (U. S. Comp. St. §§ 9585–9656), and I will now take up that question.

Of course, if the third note and mortgage are not affected by the fact of the prior existence of the first and second notes and mortgages, there would be no question that it was an illegal preference, because it was certainly made within four months of the adjudication; but the contention is that it *is* so affected —so much so that it must be held that the "substituted possession" thereunder, as petitioner calls it, relates back to the date of the second, or even first mortgage.

How can it relate back, so as to affect the rights of third parties? When Minkove gave the first mortgage, he gave no possession. A chattel mortgagor, under the first clause of section 740, must surrender possession to the mortgagee and the latter must retain it, unless, etc. It is a misuse of terms to speak of the second clause of said section 740 as "providing a substituted delivery" of possession, or a delivery of possession at all. It should rather be said that by the second clause the statute simply provides an exception to the otherwise general rule requiring delivery of possession. If that is done which the second section allows to be done, all well and good. No possession need be taken. But, if it is not done, the general law remains unchanged. Said section, which provides a method whereby a creditor or other person is enabled to "acquire and retain a special lien upon chattels while the owner remains in possession," is in derogation of the common-law rights of all general creditors, for the latter are interested in the property of the debtor to have it applied to the payment of their debts. Being in derogation, the statute must be strictly construed.

"All bona fide creditors stand on an equality before the law in respect to enforcing payment of debts, unless this equality is varied by a provision of law giving a special lien, or enabling one to acquire a special lien by complying with the provisions of law. If one attempting to create a special lien in his favor, or to take advantage of one provided by law, fails to comply with the provisions of

the law governing, then such creditor falls back into the common line occupied by the general creditors, and cannot invoke the rules or doctrines of equity to avoid this result. * * * It is an arbitrary provision of law which enables one creditor, in preference to another, to take and hold a special lien on the personal property of his debtor, leaving the possession with the debtor; and that law demands a compliance with its terms." Westheimer v. Goodkind, 24 Mont. 104, 60 Pac. 816.

The statute does not use the words *"immediate* delivery," nor does it provide any time within which the affidavit may be filed (except that it provides that a chattel mortgage is not good after one year, unless renewed as provided in section 744). It may therefore be true that compliance with the second clause of section 740 need not be done before or at the time of the making of the mortgage; but it is the doing of the things required by the statute which breathes the breath of life into the proceeding, so far at least as third persons are concerned.

"If the mortgagee, whose mortgage is not recorded, and who does not have possession of the property, records his mortgage with the consent of the mortgagor, or takes possession of the property with the consent of the mortgagor, his mortgage then has the force and effect of a mortgage executed on the day on which it is filed for record, *or on which the property is delivered.* It is the same then as though a new mortgage had been executed by the parties and recorded. The old mortgage is then given life and force and effect by the joint action of both the parties, and, hence must be held to be valid *from that time on,* as against all persons." Cameron, Hull & Co. v. Marvin, 26 Kan. 628.

"A plain and inexpensive method is prescribed by which a mortgagee may secure a priority of lien, and the evil results that may follow from ignoring it are obvious. The fiction of relation is generally used to prevent wrong or injustice, but we find no warrant in the decisions of the courts of Missouri for its employment to defeat the evident and wholesome policy of the law. There, possession of the property not being taken, a chattel mortgage seems to speak as of the day it is recorded." First Nat. Bank v. Connett, 142 Fed. 41, 73 C. C. A. 227, 5 L. R. A. (N. S.) 148.

The first mortgage was not recorded as provided by section 744. Unless the affidavit required by that section is filed at the time required by that section, the mortgage dies, for it is good only one year against creditors. Bank v. Beley, 32 Mont. 291, 80 Pac. 258.

For the same reason, the second mortgage died, beyond the hope of resurrection. The debt did not die however; but the one to whom that debt was owed, to wit, Fox, did indeed, so

far as his relation to the property and to all general creditors was concerned, fall back into the common line occupied by the general creditors—i. e. to say, none of them then had a specific lien as against the others, but each of them had a right to acquire a specific lien as against the others.

Such, then, was the situation on say June 15, 1914, and such continued to be the situation as between them until December 7 or 8, 1914 (time of the third mortgage). On the last-mentioned date Fox acquired a specific lien by compliance with the statute, and, being the first man to acquire a lien, he can avail himself of it unless the Bankruptcy Act forbids. Not only so, but the third note and mortgage were evidently given and accepted as payment of the second note and mortgage, for the second note was returned to Minkove, and the second mortgage was canceled. (Page 53.)

Bankruptcy Act, § 60, as amended, provides that a transfer made under the following conditions, to wit:

(1) If within four months prior to the filing of the petition in bankruptcy, a debtor has made a transfer of his property—said debtor being at the time insolvent; and

(2) If the effect of such transfer is to enable any of his creditors to obtain a greater percentage than any other of such creditors of the same class; and

(3) If the person receiving it or to be benefited had reasonable cause to believe that it would effect a preference, is a preference which may be avoided by the trustee.

The act further provides that:

"Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required." U. S. Comp. St. § 9644 (a), last clause.

What does the phrase "if by law such recording or registering is required" mean?

Petitioner has cited a great number of cases, both state and federal, which hold to the effect that where an unrecorded transfer is good between the parties and by statute is void only as to creditors it is not one of which it can be said "it is required to be recorded." There has always been a strong line of cases to the contrary, however; these latter holding that the phrase meant required to be recorded or registered in order to be good as against creditors. The Second, Fifth, and Ninth

Circuits adhered to the interpretation first above stated, and the Sixth, Seventh, and Eighth Circuits held to the interpretation last above mentioned.

The matter has lately been set at rest by the Supreme Court of the United States in the cases of Carey v. Donohue (March 13, 1916) and reported in 240 U. S. 430, 36 Sup. Ct. 386, 60 L. Ed. 726, L. R. A. 1917A, 295 and in Martin, Trustee, v. Commercial Nat. Bank of Macon, Ga., 245 U. S. 513, 38 Sup. Ct. 176, 62 L. Ed. 441, decided January 14, 1918.   In the first-mentioned case our highest court said:

"It is plain that the words are not limited to cases where re-cording is required for the purpose of giving validity ·to the trans-action as between the parties.   For that purpose, no amendment of the original act was needed, as in such a case there could be no giving of a preference without recording.   But in dealing with a transfer, as defined, which though valid as between the parties was one which was 'required' to be recorded, the reference was neces-sarily to a requirement in the interest of others who were in the contemplation of Congress in enacting the provision.   The natural and, we think, the intended meaning was to embrace those cases in which recording was necessary in order to make the transfer valid as against those concerned in the distribution of the insolvent estate; that is, as against creditors, including those whose posi-tion the trustee was entitled to take.   This gives effect to the amend-ment and interprets it in consonance with the spirit and purpose of the Bankruptcy Act.   See Sen. Rep. No. 691. 61st Cong. 2d Sess. p. 8.   In the present case, there was no requirement of recording in favor of creditors, either general creditors or lien creditors."

And in the last-mentioned case the Supreme Court said:

"The word 'required,' in section 60b, refers directly to statutes in many states relating to recording which through various forms of expression seek to protect creditors by providing that their rights shall be superior to transfers while off the record.   Recognizing the beneficial results of these enactments and intending that rights based thereon might be utilized for the advantage of bankrupt estates, Congress inserted (amendment of 1910) the clause 'or of the record-ing or registering of the transfer if by law recording or registering thereof is required.'   In Carey v. Donohue we pointed out that pur-chasers are not of those in whose favor registration is 'required,' but that the reference is to persons concerned in the distribution of the estate; i. e., 'creditors, including those whose position the trustee was entitled to take.'   And we think it properly follows that before a trustee may avoid a transfer because of the provision in question he must in fact represent or be entitled to take the place of some creditor whose claim actually stood in a superior position to the challenged transfer while unrecorded and within the specified pe-riod."

In order, then, to ascertain what is the true position of a creditor with reference "to the challenged transfer," let us examine our statute on the subject of mortgages, as interpreted and applied by the decisions of that state from which our statute was taken, which had been rendered up to, but not after, the time of the adoption of the statute, for it is that construction which is presumed to have been adopted.

I think our statute (section 740, Comp. Laws Alaska 1913) was taken (in June, 1900) from the Code of Montana. Senator Carter, who had charge in the Senate of the bill which resulted in Carter's Code of Alaska, was at the time a Senator from Montana, and that section (being section 311 in Carter's Code) is referred to as being section 3861 of the Montana Code. The language of the said section of the Code of Montana is almost identical with our section 740. It is conceded, in the brief of petitioner, that our section is taken from Montana.

Section 740 of our Comp. Laws Alaska 1913 (Carter's Code, § 311) provides as follows:

"Sec. 740. A mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and incumbrancers of the property in good faith for value, unless—

"(1) The possession of such property be delivered to and retained by the mortgagee; or

"(2) The mortgage provide that the property may remain in the possession of the mortgagor and be accompanied by an affidavit of all the parties thereto, or, in case any party is absent from the precinct where such mortgage is executed, at the time of the execution thereof, an affidavit of those present and of the agent or attorney in fact of such absent party that the same is made in good faith to secure the amount named therein, and without any design to hinder, delay, or defraud creditors, and be acknowledged and filed as hereinafter provided."

In April, 1900 (just two months before the enactment of Carter's Code), the Supreme Court of Montana, in the case of Westheimer v. Goodkind, 24 Mont. 104, 60 Pac. 814, supra, holds in effect that "void as to creditors" means void as to the *rights* of a creditor, but that the creditor is not in a position to enforce his right until he acquired a specific lien. When he does acquire that specific lien, however, he has a "coign of vantage," viewed from which the defective mortgage is void ab initio. In other words, the Montana court took the same position as is taken in New York, in Farmers' Loan & Trust

Co. v. Baker, 20 Misc. Rep. 387, 46 N. Y. Supp. 266, where it was said:

"It is doubtless true that there must be some act done by which the creditor acquires a lien upon or interest in the mortgaged property, in order that he may realize the benefit of the statute which declares that such a mortgage shall be void as to him where the mortgagor remains in possession, and there has been a failure to file or to refile the mortgage. This necessity is usually expressed by the statement that he must obtain a judgment and issue execution in order to acquire a lien upon the property. It is, however, incorrect to assume that the mortgage is void as to him because he is a judgment creditor. It has been repeatedly declared by the Court of Appeals that the word 'creditors,' as used in the Chattel Mortgage Act, applies to simple contract creditors, and that the word is used in its most comprehensive sense. Southard v. Benner, 72 N. Y. 424; Karst v. Gane, 136 N. Y. 316, 323, 32 N. E. 1073. The reason for the requirement is that, so far as the creditors are concerned, the mortgage is nonexistent. The property, under such circumstances, is not held upon any trust for their benefit, but is to be considered solely as the property of the mortgagor, free from the mortgage lien, and in the same situation as any other property owned by him, and therefore subject to appropriation by his creditors for the payment of their claims only through the use of such remedies as the law supplies for the appropriation of a debtor's property to the discharge of the claims of his creditors. Tremaine v. Mortimer, 128 N. Y. 1, 6, 27 N. E. 1060. The reason for the rule, therefore, does not make the recovery of judgment upon the claim indispensable if the property has been in some form legally appropriated for the discharge of their debts,"
—and as is taken in Missouri, Mississippi, and New Jersey.

By the filing of the bankruptcy petition, all general creditors, therefore, moved up to this "coign of vantage" through the trustee; that is to say, that under our statute registration is required of a mortgage unaccompanied by delivery, if the *right* of a creditor (as distinguished from his position and power to exercise that right) is to be cut off. There being no possession under the first or second mortgage, the creditors "stood in a superior position to them while unrecorded"—i. e., they could have had them set aside (and the way they were to go about doing that is to establish their debt in court and levy execution), and they continued to stand in that superior position until the date of the third mortgage.

If, therefore, as contended, the third mortgage is a mere substitution of securities, it is a substitution within four months of

bankruptcy, the effect of which is to give Fox a preference which he did not have before that.

(1) Was Minkove insolvent when Fox filed the sufficient mortgage "required" to be filed? The referee finds that he was, and I think the evidence abundantly sustained him.

(2) Was the effect of such transfer to enable Fox to obtain a greater percentage than other creditors of the same class? The referee finds that such was the effect, and I think that it is apparent the referee must be sustained on that point.

(3) Did Fox have reasonable cause to believe that said transfer would effect a preference? The referee finds in the affirmative, and his finding will not be disturbed, as it is based on ample evidence.

Clearly, then, all the essential characteristics of an illegal preference have been shown.

The third finding and the conclusion and order of the referee awarding a priority to Fox must be reversed. In all other respects, I think the decision of the referee should be sustained.